
FILED
IN OPEN COURT

NOV 10

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>CARLOS MARIO MEJIA LOPEZ, )<br>   a/k/a "Julian," )<br>)<br>LUIS ROGELIO LOZANO CORREA, )<br>   a/k/a "El Negro," )<br>   a/k/a "Nino," )<br>)<br>ISMAEL ENRIQUE TUIRAN MIRANDA, )<br>   a/k/a "Gordo," )<br>)<br>LUDWICK MARK STEPHEN IBARRA )<br>FRANCO, )<br>   a/k/a "Stephen," )<br>)<br>JORGE EMIRO BARBOSA ALVAREZ, )<br>   a/k/a "Juan," )<br>)<br>   Defendants. ) | **UNDER SEAL**<br><br>Case No. 1:16-cr-256<br><br>Count 1: 21 U.S.C. §§ 959(a), 960, 963<br>(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing, Intending, and Having Reasonable Cause to Believe that it will be Unlawfully Imported into the United States)<br><br>Forfeiture: 21 U.S.C. § 853<br>(Criminal Forfeiture) |

## INDICTMENT

November 2016 Term — Alexandria

*General Allegations*

At all times material to this Indictment.

1. Colombia is responsible for the production of the majority of cocaine imported into the United States.

2. Because of the illegal nature of the international commercial cocaine enterprise, drug trafficking organizations operate in a closed and secretive manner in an effort to avoid detection by law enforcement.

3. Because of the significant supply of cocaine produced in Colombia, and the corresponding demand for cocaine in the United States, millions of dollars in profits are generated by those operating and involved in the illegal international and cross-border transportation and distribution of cocaine.

4. Much of the cocaine is produced at illicit laboratories located in the Colombian interior, and then transported to border areas.

5. The cocaine that leaves Colombia is commonly distributed along the Central American corridor to Honduras, Guatemala, and Mexico for eventual shipment to the United States.

6. There is no substantial domestic drug market in the Central American countries and Mexico for cocaine, while there is robust demand for the drug in the United States.

7. Additionally, the price of cocaine increases at each stage of the supply chain as the cocaine is transported from Colombia to Central American nations and further north to the United States. The incremental price increases enable multiple drug traffickers to make substantial profits on the shipments of cocaine.

8. In order to transport cocaine from the Colombian border areas to Central American countries, drug traffickers use various modes of transportation including, but not limited to, maritime vessels (including boats and semi-submersibles) and aircraft.

9. Once the cocaine arrives in the Central American countries, members of drug trafficking organizations receive the cocaine shipments and then direct this cocaine on to the United States, where it is sold for profit.

# COUNT ONE

*(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing, Intending, and Having Reasonable Cause to Believe that it would be Unlawfully Imported into the United States)*

THE GRAND JURY CHARGES THAT:

1. The Grand Jury re-alleges and incorporates by reference the General Allegations of this Indictment.

2. From in and around at least February 2016 and continuing thereafter up to and including the date of this Indictment, the exact dates being unknown to the Grand Jury, within the jurisdiction of the United States and in an offense begun and committed outside the jurisdiction of a particular State or district, including in Colombia, Honduras, and elsewhere, the defendants, CARLOS Mario Mejia Lopez (also known as "Julian"), LUIS Rogelio Lozano Correa (also known as "El Negro" and "Nino"), ISMAEL Enrique Tuiran Miranda (also known as "Gordo"), Ludwick Mark STEPHEN Ibarra Franco (also known as "Stephen"), and JORGE Emiro Barbosa Alvarez (also known as "Juan"),[1] all of whom will be first brought to the Eastern District of Virginia, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing, intending, and having reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a) and 960.

---

[1] Each defendant will be referred to herein by the portion of his name that is in all capitalized letters in this paragraph.

## WAYS, MANNERS, AND MEANS

The primary purpose of the conspiracy was to make as much money as possible by trafficking cocaine destined for distribution in the United States through Central America and elsewhere. The ways, manners, and means by which the defendants and other members of the conspiracy carried out the primary purpose of the conspiracy included, but were not limited to, the following:

3. It was part of the conspiracy that members played different roles, took upon themselves different tasks, and participated in the affairs of the conspiracy through various criminal acts.

4. It was further part of the conspiracy for some members to operate and control cocaine laboratories in Colombia capable of producing several hundred, if not thousands, of kilograms of cocaine in a calendar year.

5. It was further part of the conspiracy for some members to have access to thousands of kilograms of cocaine.

6. It was further part of the conspiracy for some members to have access to and use multiple methods of transport to import cocaine into Central America from Colombia, to include maritime vessels (including boats and semi-submersibles) and aircraft.

7. It was further part of the conspiracy for some members to introduce prospective co-conspirators to other members of the conspiracy.

8. It was further part of the conspiracy that members offered to test samples of cocaine for purity to attract prospective co-conspirators, who would be interested in distributing hundreds or thousands of kilograms of cocaine in Honduras and elsewhere, for ultimate distribution in the United States.

9.  It was part of the conspiracy that several of the members relied on various forms of communication including, but not limited to, BlackBerry PIN to PIN communications, other phone communications, and in person meetings. In an effort to avoid the detection of law enforcement, members of the conspiracy took certain safeguards with regard to their communications, including, but not limited to, using BlackBerry messenger communications, which they understood that law enforcement could not intercept, subscribing to their devices in false names or aliases, and speaking in code when discussing cocaine trafficking and associated crimes.

## OVERT ACTS

In furtherance of the conspiracy, and to effect and accomplish the objects thereof, one or more of the defendants and other co-conspirators, both known and unknown to the Grand Jury, committed, among others, the following overt acts in the country of Colombia and elsewhere:

10.  On or about February 29, 2016, CARLOS and ISMAEL met with cooperating sources in Santa Marta, Colombia, to discuss traveling with the cooperating sources to a semi-submersible vessel.

11.  On or about March 1, 2016, ISMAEL traveled with cooperating sources to in and around Turbo, Colombia, the exact location being unknown to the Grand Jury, to show the cooperating sources a semi-submersible vessel capable of transporting several thousand kilograms of cocaine.

12.  In and around March 2016, ISMAEL sent a cooperating source a picture via Blackberry messenger of several hundred kilograms of cocaine, and asked the cooperating source to transport the cocaine to Honduras with the understanding that the cocaine would be further distributed in the United States.

5

13. On or about April 5, 2016, CARLOS, LUIS, and ISMAEL, met with cooperating sources in Santa Marta, Colombia, to discuss transporting 300 to 460 kilograms of cocaine to Honduras.

14. On or about June 8, 2016, ISMAEL and an uncharged co-conspirator, met with cooperating sources in Santa Marta, Colombia, and accepted $4,000 in U.S. currency from the cooperating sources as a down payment on five (5) kilograms of cocaine.

15. On or about June 10, 2016, ISMAEL and an uncharged co-conspirator, met with cooperating sources and an undercover law enforcement officer in Santa Marta, Colombia, to provide the cooperating sources with five (5) kilograms of cocaine. The cocaine, however, was not available.

16. On or about June 11, 2016, ISMAEL sent a cooperating source a picture via Blackberry messenger of what appeared to be five (5) kilograms of cocaine.

17. On or about June 13, 2016, ISMAEL sent a cooperating source a picture via Blackberry messenger of what appeared to be five (5) kilograms of cocaine.

18. On or about July 12, 2016, LUIS and STEPHEN met with a cooperating source in Santa Marta, Colombia, to discuss a sale of five (5) kilograms of cocaine.

19. On or about July 13, 2016, LUIS, STEPHEN, and JORGE, in Santa Marta, Colombia, sold approximately five (5) kilograms of cocaine to a cooperating source and an undercover law enforcement officer in return for 18 million Colombian pesos and $200 in U.S. currency.

20. On or about September 6, 2016, LUIS and other uncharged co-conspirators met with cooperating sources in Santa Marta, Colombia, so that an uncharged co-conspirator could test the purity level of a sample of cocaine offered by LUIS for distribution.

21. On or about September 7, 2016, LUIS and other uncharged co-conspirators met with cooperating sources in Santa Marta, Colombia, so that an uncharged co-conspirator could test the purity level of a sample of cocaine offered by LUIS for distribution.

22. On or about October 24, 2016, CARLOS and an uncharged co-conspirator met with a cooperating source in Medellín, Colombia, to discuss a several hundred-kilogram shipment of cocaine on a future date.

23. On or about October 26, 2016, LUIS and other uncharged co-conspirators, in Santa Marta, Colombia, sold cooperating sources and an undercover law enforcement officer approximately ten (10) kilograms of cocaine in exchange for $16,000 in U.S. currency.

(All in violation of Title 21, United States Code, Section 963)

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS there is probable cause that the property described below is subject to forfeiture. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, the defendants are hereby notified that if convicted of the violations charged in this Indictment, the defendants shall forfeit to the United States any property traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of the defendants' offenses and any property used or intended to be used to commit or facilitate the commission of the charged offenses.

(Pursuant to Title 21, United States Code, Section 853)

A TRUE BILL

_____
Foreperson of the Grand Jury

Dana J. Boente
United States Attorney

By: _____
Carina A. Cuellar
Assistant United States Attorney